The next case on for argument is Murphy v. City of Newburgh. We're sending message downstairs that you'll be down shortly. I appreciate your assistance. Thank you. Good morning and may it please the Court. Michael Sussman representing Helen Murphy. The district court in our view improvidently granted summary judgment on a retaliation claim. That's the claim up here before the Court. I think there are five issues for the Court to focus on, whether the plaintiff's complaint was in fact understood as one about gender hostility and bias. The issue with respect to that, as I'm sure you've read, is that it's a somewhat vague complaint. It's a complaint which talks, in writing at least, in a way that's about harassment and bullying and does not specify gender. Ms. Murphy's affidavit at the JA 861 indicates that when she spoke with Cherevino, the city manager, she spoke with him about a pattern of gender bias, brusqueness towards women, which was not demonstrated toward men. He then called labor counsel and an outside investigation was done. Sotomayor in that description that she gave, and I don't disagree with you, it was something along those lines, was just one other person, right? No. Oh, no, no. The testimony is that when she first started, four women. I'm sorry. Four women, four women, when she started, told her about the problem with Aber and his treatment toward other women. They were all subordinates. They had a hearsay problem with that, so go ahead. I'm sorry. They were all subordinates of hers. She said to them, if it repeats itself and I see it, I'm going to do something about it immediately because I don't think it should continue. She began seeing it, and then she goes to the city manager. The city manager then does this investigation. Aber finds out about the investigation. There's no dispute on the record about that, although if you read Aber's deposition, as I'm sure you may have, he doesn't remember anything about anything, but he does remember knowing about the complaint, although he says he doesn't. Am I correct, though, that her boss, Mr. Aber, who is alleged to have been condescending toward women, but all of the people working there were women?  He supervised other units, and in the other units, in the interaction observed with the other units, there were men in these other units. So you're correct that in her unit, there were women, but his supervisory responsibility was broader than that. So the observation she was able to make in meetings where he was interacting with men, including subordinate males, and that was the difference she was seeing. So you are correct about that unit, but not in terms of his total sphere of supervision. The second question raised is whether Aber knew of her complaint. JA 832 seems to establish that. The third is whether Aber harbored a retaliatory animus. Now, again, we've had this in other cases, but in this particular case, the statement is made, this is what you get for wasting my time with an investigation, on October 1st when he gives her the evaluation. I don't think that there could be anything much more directly retaliatory than a statement like that. This is what you get for wasting my time with an investigation. Again, in the prior case, this is a summary judgment motion. You have to take the facts most favorably to plaintiff. She testifies to it. He doesn't deny it. He claims not to remember anything about it. He doesn't remember anything about much. So that's the third issue. Sotomayor, I mean, I'll go with you in two and three for argument's sake right now. But take me back to how they were on notice that her complaint was about a Title VII gender-biased discrimination. She's in a meeting with Scheravino, separate from what the e-mail is. The e-mail triggers a meeting. At the meeting, she's not. You'll agree that the e-mail isn't adequate. I do. All right. At the meeting, she indicates to Scheravino that there's a pattern of conduct by him which is harsher directed toward women than to men. He is brusque. He is condescending, as the Court used that term. He's treating women in a way that is creating for them a hostile environment. That essentially is the claim. It's a hostile environment-type claim. It's a hostile environment-type claim. Sotomayor, but you're only arguing about a retaliation or in assessing retaliation. I'm not, as you know from the law, I don't have to establish that claim other than it was made in good faith. I don't have to show that she would win that claim. I have to show that she made the complaint. So the issue is whether her complaint was sufficient, as you properly point out, to trigger the anti-retaliation provision of Title VII. My argument is that it is sufficient. You have to assess. I'm sorry. I'm not with ABER, but- City manager, Scheravino. That's right. City manager is the administrative head of the city. It's a weak form of government. The city manager runs the government and runs the city. So I'm at the fourth issue is then whether Scheravino relied upon ABER's views, which is a Bach v. Hastings v. Hudson issue. And clearly, if you look at JA 750 in the record of Scheravino's testimony, he acknowledges he relies on ABER's views strongly in the dismissal decision. I don't think, again, they can argue something else at trial, but for purposes of summary judgment, that seems to me pretty clearly established. If ABER has retaliatory instincts and animosity as manifested by the comment, the only issue, to my way of thinking, is does that carry over into the termination decision several months later? So you look at the course of behavior between the time he made that comment on October 1st and the time that the termination memo of December 30th occurs. Now, there's an allegation that she was withheld support for the training assistants. Temporally, where did that occur? That's very important. I was just getting to that. You're right on the point. And here's the issue. She claims that what happened is they know she has no municipal experience. They know that the tasks that she's doing, and this is important to understand, are different as the year progresses. One thing comes up in April. Another thing comes up in August. Another set of tasks come up later in the year. So you don't train all at once at the beginning. The training is ongoing. In November, October-November time period, he says directly to his — to her staff who had been helping her, like Aquino, and there were several women who had been helping her, stop helping her, don't help her anymore. This is at the same time that counseling memo says, I'm going to meet with you once a week to assess how you're doing. He never has the weekly meetings, and he tells his staff to desist — his staff to desist from helping her. That's her testimony. And she — But the record shows that it — that the concerns about her capabilities were bubbling up from below, because people who were helping her were basically saying that she's not — she's not learning this stuff, and she just wants me to do her job. Absolutely disputed. I understand that's — that's part of their defense, but it's absolutely disputed that that's accurate in the record. Her testimony, which is memorialized in her rebuttal letter to his October 1st counseling, is that many of the tasks that she'd been trained and she had mastered and was, in fact, doing on a day-to-day basis. So I understand there's a dispute as to errors, but again, even if the employee is not perfect, the question here still becomes a dispute as to whether the retaliatory animus is the driving force in the termination or whether, for instance, they would understand that she'd make some errors learning the job. Anyone would, given the complexities that she was being asked to absorb. So she made a few errors they would have otherwise been assimilated, and she would have moved on. What really happened is a draconian termination based on the retaliation. That's the factual dispute. Okay. So let me just get to the fifth issue. At what stage do we consider or does the system consider essentially the but-for requirement, i.e., she would not have suffered these things had she not retaliated? The retaliatory standard is a but-for standard. Right. So you must consider it ultimately in rendering a decision in the case. That's true. But in doing that, you have to look at, you have to weigh, if you will, the nature of the problems she was having and whether it's reasonable for a jury to believe that those did stem from this desisting and declination of training, as she indicates, or whether there was, as the Court's question suggests, something almost more character logical about her failing. She couldn't absorb the job. She couldn't do the job. That, I think, is quintessentially a fact issue. My time is up, and given my situation, I'm not going to ---- You said there's a fact issue as to whether she was asking or requiring other people to essentially do her job. But is there a fact issue as to whether those complaints were made to city management? Yes. There's a fact issue as to whether they were made and when they were made. When I questioned specifically the city manager, Chair Vino, about these various alleged complaints, he had, again, you can review it, he had no knowledge of them. He did not rely on them. He didn't know about them. And that was his testimony. Thank you. And you've reserved two minutes. Good morning. Good morning, Your Honors. May it please the Court. My name is Matthew Maynard of Lamb and Barnosky on behalf of the City of Newburgh. This is a very simple case, actually, and there's not a lot of facts that are in dispute. Plaintiff was hired. She was in her probationary period. She was underperforming. At every moment she was on the job, she was underperforming. There is no dispute in early August of 2015, she made a complaint by email to the city manager about the bullying and harassing behavior of her supervisor, Mr. Aber. Nowhere in that complaint, and opposing counsel has now conceded this point, the email itself doesn't raise an issue of gender or race discrimination. And the reason I raise race is because that was one of the claims that was raised in the initial complaint in this case, but has been, was dismissed on summary judgment and appeal. When you have someone who's hired, who's not qualified for the job, I mean, it's candidate, has to be trained on the job, aren't they going to be underperforming if you consider the performance level to be that of a person who has been trained? I believe that the city had enough— You're always going to be, you're always going to be, you know, catching up and you're always going to be behind the curve. I think when the city, and there's no real dispute about this, when the city hired Ms. Murphy, it told her that they would provide her training. They did provide her training, and the record has both plaintiff's testimony, as well as other documents, not anybody's testimony, but actual contemporaneous documents in the form of emails demonstrating that Ms. Murphy was provided with adequate training here, and even during the period, I'm skipping ahead a little bit timeline wise, and forgive me for that, but I want to stay on this point, even after Ms. Murphy complained, there's no dispute she did that, she continued to receive training, and that's borne out in the emails that are in the record, contemporaneous emails from her female co-workers demonstrating that they were continuing to provide her with assistance on her daily chores, which were reconciling the money coming in and the money going out, making sure that money was timely deposited in the city's bank accounts. As the tax collector, she was charged, and her staff, with collecting actual money in the form of credit card payments, cash, checks. In the bank accounts, or the safe? Well, what she was required to do was make deposits. So when money would come in, you would have a 48-hour window within which to reconcile that money. What it means is Ms. Murphy and her staff were to take the money in and credit whatever taxpayer account needed to be credited. So they had a balance sheet, both by day and by month. Ms. Murphy's responsibility, and her primary duty in this case, was to conduct those reconciliations, both on a daily basis and a monthly basis. Once the money was reconciled within the 48-hour period, the money was removed from the safe and deposited into a bank account. Ms. Murphy consistently had problems timely depositing the money, timely reconciling accounts, and that continued to manifest itself. Even after she made her complaint, and there's no dispute she made a complaint, there's no dispute the city investigated the complaint. The dispute is in whether that complaint constitutes protected activity. Ms. Murphy's complaint doesn't raise any issue of gender or race discrimination. What do you do about the argument that we discussed when Mr. Eisenman was up there that she alleged, or she's, the record that we look at is that Ms. Murphy said he's treating women differently from men and it's tough for us women. As the lower court concluded, that is not an objective, good faith belief. And the reason is Ms. Murphy cannot identify, and has not, this record is barren of any distinction or any specific allegation of any male employee who was similarly situated to her, who was treated poorly by Mr. Aber. Is that the comparator? That would be, she would need to find some male employee who worked under Mr. Aber. What about, are there other male, does the record show if there are other male employees who work under Mr. Aber or does he only supervise women? The record in this case shows that the two departments that Mr. Aber presided over, which would have been the comptroller's office and the tax collector's office, which is a sort of branch, a sub-branch, are populated entirely by females. The, there are male employees, obviously there are male employees of the city, but the one person that plaintiff attempted during her deposition to point to is somebody who works for the information technology department and didn't answer to Mr. Aber. And in fact, that employee had a problem with Mr. Aber as well. Male and female employees complained about the way he spoke to them. They all had this similar complaint, bullying, he was intimidating, but that comes across both, and the record contains this, and the lower court pointed to it. A male employee complained about the same exact conduct the plaintiff is complaining about. Plaintiff doesn't see Mr. Aber. Sotomayor, does that necessarily mean that the complaint that she made was, was made in bad faith? I mean, you can make a complaint of gender discrimination and, and it can be invalid. But if you, if you think it, it's a thing you, that, that is a fair subject of complaint, you're still protected from retaliation. If I might, I don't believe that plaintiff, and I'm not saying that the plaintiff made a bad faith complaint. No, I'm just saying, you, you don't have to make one that, that's watertight. You don't even have to make one that's especially good. I would agree with that. You just have to believe that that's, you know, in good faith that this is what's happening. I would agree, except here the issue is whether or not the complaint itself was one of gender discrimination, as opposed to general workplace conduct and misconduct. That's why the city, the plaintiff makes a lot of, the city investigated this. Of course they investigated it. This was an instance of arguably workplace bullying. Of course they investigated it. Why were her statements to the city manager enough to bring it within the ambit of, of Title VII? Well, the issue here is where were those statements made, and she made them in an affidavit in an effort to avoid summary judgment. Not in her deposition transcript. She said she met with Mr. Chirivino. She talked about, I talked to him about my complaint. He told me that he would investigate it, which, all of which is true. But Ms. Murphy's affidavit submitted in opposition to the motion goes well beyond what is in her deposition. And that is where a lot of the problem lies. A lot of what she. The trial court shall not and we on the appeals court shall not consider affidavits put in in opposition to motion for summary judgment. I'm recalling one case, I'm sorry, I'm recalling one case vaguely and I have not been able to chase it down where a panel of this court essentially affirmed the district court's total discounting of the affidavit. But I have not. Why is that not just supplementary and saying, oh, yeah, well, I said that in the deposition and I'm also telling you that this happened and in the way I'm telling you that this happened, that's sufficient to maintain at least through summary judgment a Title VII claim. Your Honor, the issue here is she raised it, why is she raising it? There is case law and I'm, forgive me because I'm not recalling the name, but there are cases that say very specifically you can't raise an issue in opposition to summary judgment for the first time in an affidavit when you've been deposed. She had the opportunity here. She didn't take it at her deposition and she was asked at length about these things. She amplified it with additional detail which is now the subject of her argument before this court. That's the issue, not necessarily that she raised it or that she raised it in an affidavit is not necessarily the only problem. She also raises issues about what other employees told her about Mr. Aber. That's all hearsay and it's inadmissible. If I could, the other issue here is plaintiff raises an argument that the alleged misconduct by Mr. Aber escalated after the complaint. And again, the documents here, not anybody's testimony, the documents in the form of e-mail, which is the primary mode of communication between Mr. Aber and Ms. Murphy, demonstrate that that is not true. That in fact, Mr. Aber continued to point out things that Ms. Murphy was doing wrong and he did it before the complaint, he did it in the period between when the complaint was issued and when the counseling memo was issued, and he continued to do it after the counseling memo but before the termination. Ms. Murphy simply never took the counseling to heart. She never improved her performance. And in fact, the record shows that in November, after the counseling memo, after this alleged comment, she engaged in various incidents of misconduct here. She failed to secure money. She, at her direction, a tax lien was taken out on a resident because she failed to plead. There is issues about the reconciliation. Plaintiff admits that her November reconciliation to in the first two weeks of December of 2015 was not complete in the middle of January 2016 when she was terminated. She could not do her job. That's why she was let go, not retaliatory animus. Even if you believe that the comment was made, there's so many things that happen in between the comment and the termination, namely her poor performance, that you — that the city respectfully requests that you affirm the lower court's decision. Thank you, Your Honor. Thank you. Thank you, Mr. Manning. Mr. Sotomayor. With regard to the issue of her changing her testimony, the complaint, JA9, paragraph 31. On August 22, 2015, plaintiff complained to the city manager that Aber mistreated female employees and was harsh and verbally abusive toward her and other female subordinates. It's right in the complaint. It's not being brought up for the first time in some affidavit. The counsel, if you read the deposition, is trying in the deposition, her deposition, to avoid eliciting testimony which would be damaging to his client. He never asked direct questions. It's right here. What you read was an allegation concerning subordinates, and all the subordinates were women. All the subordinates were not women. There were male subordinates. See, what's going on is the Comptroller had very broad scope. He's indicating the IT person was an individual who was reporting to the Comptroller in the city. Now, counsel says that's not true. It was true. He was reporting to the gentleman. She saw interactions repeatedly between them. Aber was giving the IT person directions, which are in the record, as to how to deal with her problems. So she did see that, and she was able to observe that, and she observed conduct with other men as well. So I don't agree with counsel's characterization of the record. But beyond that, there's no dispute that — dispute in terms of the facts taken most favorably to plaintiffs that Aber explicitly told her staff to stop cooperating with her and giving her assistance and training after that October 1st counseling memorandum. Then she was unable to complete fully certain tasks. She was asking her staff for help. He was saying, I'm meeting with her weekly. You don't help her. I'm meeting with her. He never convened a weekly meeting with her. The documentary evidence from DeMora after — during this period, after the complaint, after help is withdrawn, as you say, where DeMora is saying, I'm tired of helping her, and I — and I can't keep doing both our jobs, essentially. DeMora is also reporting directly to a supervisor, namely Mr. Aber, who is going around Ms. Murphy directing her staff. Her staff is fully aware of the antipathy that Aber holds towards her, and her staff is reacting in that way. Again, it doesn't raise anything more than a fact issue as to whether his retaliatory animus was pervading the workplace. Thank you for the opportunity. Nice to be with all of you again. I'm running. If you want to dash out and get downstairs, you're good. Thank you both. I hope the elevators are working better than usual. Don't take the stairs, though. You might not get back in. All right. The last case, let me see, is Mr. Curtis here? All right. We will take Mr. Curtis versus — Curtis versus United States of America on submission. The last case, U.S. versus Sanchez, is on submission, so I will ask the clerk, please, to adjourn court. Thank you. Don't wait around for me, please. Sorry. Thank you.